**Opinion issued October 13, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00337-CR

———————————

**FAROUK DAVID ODARIKO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 400th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 11-DCR-58765A**

## MEMORANDUM OPINION

Appellant Farouk David Odariko was charged with four counts of aggravated robbery with a deadly weapon.[1] The jury found appellant guilty on all

---

[1] See TEX. PENAL CODE ANN. §§ 29.02–.03 (West 2013).

four counts and assessed his punishment at twenty five years' confinement. In two points of error, appellant contends that (1) the evidence identifying him was legally insufficient to convict him of aggravated robbery and (2) the evidence that he used or exhibited a deadly weapon was legally insufficient to convict him of the charged offense. We affirm.

## Background

Ernesto Batista, a security officer with IBC Bank, testified that he was notified that the IBC Bank branch at Highway 6 and West Bellfort in Fort Bend County, Texas, had been robbed. When he arrived at the bank, Batista reviewed the surveillance video from the security camera and provided a copy to law enforcement. The State introduced the video at trial, which showed four individuals armed with handguns entering the bank, two of whom jumped over the counter. Batista testified that several of the bank employees told him that a man entered the bank moments before the robbery and asked one of the tellers about opening an account, but that when the teller gave him the necessary information, he told her that he was not interested and walked out of the bank. Batista also gave the police the portion of the video showing the man in the bank approximately ten minutes before the robbery.

Sergeant David McKinnon with the Fort Bend County Sheriff's Office testified that he interviewed witnesses to the robbery, including bank customer

2

Imran Yousef and bank teller Merriyum Minhaj. Yousef told Sergeant McKinnon that he saw a man talking with a teller and then leaving the bank without making a transaction shortly before the robbery occurred. At trial, Yousef identified appellant in the bank's surveillance video as the man he had seen in the bank. Minhaj told Sergeant McKinnon that an individual came into the bank approximately ten minutes before the robbery to inquire about opening a new account but that when she asked him if he had the necessary documentation, he stated, "no, that's okay," and walked out of the bank. Minhaj told Sergeant McKinnon that she found the incident odd at the time.

In the course of his investigation, Sergeant McKinnon released several still photographs from the video footage—including one of the man seen in the bank shortly before the robbery—in the hopes of generating leads to identify the robbery suspects. Afterwards, Sergeant McKinnon received a call from a Harris County police officer who identified appellant as one of the suspects in the photos. Sergeant McKinnon also received several Crime Stoppers tips identifying appellant from the still photos. Sergeant McKinnon testified that he also learned that appellant drove a silver Buick Lucerne that matched a vehicle shown in the surveillance video arriving in the bank's parking lot shortly before the robbery.

Based on the Crime Stoppers tips and his subsequent interviews, Sergeant McKinnon was able to identify the armed robbers as Ashley Jackson, Jonathan

3

Simmons, Amyillia Bruno, and Darius Broussard. Simmons's girlfriend, Anessa John, later identified Dominique Blakley, Brandon Boudy, and an individual nicknamed "Spook" as individuals driving the getaway cars. Following their arrests, Simmons and Jackson confessed to their roles in the robbery. They told Sergeant McKinnon that they had met with the other accomplices, including appellant, at a Holiday Inn Express hotel shortly before the robbery. In her interview with Sergeant McKinnon, Bruno confessed to her role in the robbery and told him that she had participated in the meeting at the hotel and that appellant was present at the meeting.

McKinnon testified that Simmons, Jackson, and Bruno told him that appellant, whom they knew as Spook, was one of the getaway drivers for the robbery. The State introduced a booking photo of appellant showing a tattoo of the word "Spook" on the right side of his neck.

Blakley testified that he waited outside of the bank during the robbery and then drove Jackson, Simmons, and Bruno to a nearby neighborhood where Barros and Spook were waiting in other cars to drive the robbers away. Blakley identified appellant in court as Spook. Blakley identified three of the armed robbers as Simmons, Jackson, and Bruno on the bank surveillance video. Blakley testified that he and the others had originally intended to rob a credit union but, when it became no longer possible, appellant suggested that they rob the IBC bank.

4

Simmons testified that he participated in the robbery and was testifying at trial in the hope of receiving a more lenient sentence. Simmons identified Bruno, Jackson, and Broussard as the individuals who robbed the bank with him. Simmons also identified appellant in the bank's surveillance video as the person who came into the bank shortly before the robbery. He further testified that one of the vehicles used in the robbery was appellant's Buick Lucerne. Simmons testified that he, along with Jackson, Barros, Broussard, Blakley, Bruno, and appellant, were the individuals on the hotel's surveillance video, and he also identified appellant as the individual walking to a gray car in the hotel parking lot. Simmons and Barros knew appellant through their gang affiliation.

Simmons testified that after he and his accomplices arrived in a neighborhood near the bank, appellant went to the bank and returned a few moments later and told them, "It's a go, it's good." Simmons testified that he understood appellant to mean that the bank looked like a good place to rob. After committing the robbery, the accomplices drove to the nearby neighborhood, got into appellant's car and another car, and fled the area. Simmons testified that he and the others later met at Barros's house to split up the stolen money. He testified that appellant was present at Barros's house and received some of the money. Simmons stated that the guns used in the robbery came from Barros's house and

5

were stored in appellant's car prior to the robbery. Simmons further testified that the .38 caliber gun he used in the robbery belonged to appellant.

Bruno, who had previously entered into a plea agreement with the State, testified that she participated in the robbery of the IBC bank. She stated that Simmons and appellant called her and asked if she wanted to rob a bank with them. Bruno agreed and went with Simmons and appellant to appellant's house where appellant gave them the guns in a pillowcase to use in the robbery. She testified that she and the others—Simmons, Jackson, Broussard, Barros and Blakley— drove to a neighborhood near the bank while appellant went to "case the bank." Bruno testified that when appellant returned, he told them how many tellers were in the bank and that there were no security guards.

Bruno identified appellant in still photos from the bank's and hotel's surveillance videos as the individual wearing a shirt with the word "World" on it. Bruno testified that appellant suggested robbing the IBC bank because he knew someone inside the bank branch and told the others that it was an "easy job" and that they should get the money from the second drawer. After the robbery, Bruno and the others, including appellant, met at Barros's house to split the money. Bruno testified that appellant got a cut of the money. Bruno identified appellant in court as the same individual in still photos from the bank's and hotel's surveillance videos.

6

The State recalled Sergeant McKinnon, who testified that appellant was the person in the hotel video wearing the shirt with the words "World Class," and that appellant was wearing the same shirt in the bank surveillance video. McKinnon testified that, in his interviews with them, Jackson, Bruno, Simmons, and Blakley mentioned Spook when discussing the robbery and their statements were largely consistent with one another.

The jury ultimately found appellant guilty of all four counts of aggravated robbery and assessed punishment at twenty-five years' confinement. This appeal followed.

## Sufficiency of the Evidence

In his two points of error, appellant contests the legal sufficiency of the evidence identifying him and the evidence that he used or exhibited a deadly weapon.

### A. Standard of Review

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of

7

evidence). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). A jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jones v. State*, 458 S.W.3d 625, 630 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (noting jury can choose to disbelieve witness even when witness's testimony is uncontradicted) (internal citation omitted).

We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination."). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011) (quoting *Clayton*, 235 S.W.3d at

778). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

## B. Aggravated Robbery

To establish that appellant committed the offense of aggravated robbery as charged in the indictment, the State had to prove that appellant, in the course of committing theft and with intent to obtain or maintain control of the property, intentionally or knowingly threatened or placed another in fear of imminent bodily injury or death and used or exhibited a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 29.02(a)(2), 29.03(a)(2) (West 2014). The jury was instructed that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West 2011). The charge further instructed that "[a] person is criminally responsible for an offense committed by the conduct of another if: . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ." *Id.* at § 7.02(a)(2).

**1. Identification Evidence**

In his first point of error, appellant contends that the evidence identifying him as a party to the robbery was legally insufficient to support his conviction. Specifically, he argues that only Blakley, an accomplice, identified him in court as a party to the robbery and that this accomplice evidence alone cannot support the jury's verdict.

Article 38.14 of the Code of Criminal Procedure states that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2014). In *Reed v. State*, the Court of Criminal Appeals explained,

> In applying the test of the sufficiency of the corroboration, each case must be considered on its own facts and circumstances. All the facts and circumstances in evidence may be looked to as furnishing the corroboration necessary. The corroborative evidence may be circumstantial or direct. The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense supplies the test. It is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. Insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of accomplice witness testimony.

744 S.W.2d 112, 126 (Tex. Crim. App. 1988) (internal citations omitted).

10

In addition to Blakley's testimony that Spook was one of the getaway drivers involved in the robbery and his in-court identification of appellant as Spook, the evidence presented at trial included the time-stamped bank surveillance video and still photos taken from the video showing appellant in the bank ten minutes before the robbery and the hotel surveillance video and still photos showing appellant exiting the hotel elevator and walking to cars in the hotel parking lot with Simmons, Jackson, Barros, Broussard, Blakley, and Bruno. *See McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) (concluding evidence that defendant was in presence of accomplice at or near time or place of crime is proper corroborating evidence); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992) (finding presence at crime scene combined with other suspicious circumstances constitutes sufficient corroboration). Several of appellant's accomplices identified him by his nickname, Spook, and by his legal name. Sergeant McKinnon also testified that, after he released one of the still photos to the media, he received a call from a law enforcement officer as well as several Crime Stoppers tips identifying the man in the photo as appellant. The jury also saw a booking photo of appellant which showed a tattoo of the word "Spook" on his neck.

The combined cumulative weight of the incriminating evidence, independent of Blakley's testimony, tends to connect appellant with the aggravated robbery.

11

*See Reed*, 744 S.W.2d at 126. Viewing the evidence in the light most favorable to the verdict, we conclude that there was legally sufficient evidence identifying appellant as a party to the robbery. We overrule his first point of error.

## 2. Deadly Weapon Evidence

In his second point of error, appellant argues that the evidence is legally insufficient to show that he was aware that a deadly weapon would be used or exhibited during the robbery. Therefore, he concludes, there is insufficient evidence to support his conviction of aggravated robbery.

The surveillance video and testimony at trial showed that Simmons, Jackson, Bruno, and Broussard were armed when they robbed the IBC bank. Simmons testified that the .38 caliber gun he used in the robbery belonged to appellant, and that the guns were stored in appellant's car prior to the robbery. Bruno also testified that, after she agreed to participate in the robbery, she accompanied Simmons and appellant to appellant's house where appellant gave them guns in a pillowcase to use in the robbery.

In *Vasquez v.* State, 56 S.W.3d 46 (Tex. Crim. App. 2001), the Court of Criminal Appeals squarely addressed the question of whether article 38.14 requires corroboration of accomplice-witness testimony regarding a deadly weapon finding. In concluding that it does not, the court noted:

> Article 38.14, by its very terms, requires corroboration of accomplice testimony for a conviction only. This means there must be

12

some non-accomplice evidence tending to connect the defendant to the crime, not to every element of the crime. The corroboration requirements are inapplicable to the testimony of accomplice witnesses regarding the use or exhibition of a deadly weapon.

*Id.* at 48 (internal footnote omitted).

Here, the evidence showed that guns were used in the commission of the offense and accomplice testimony that appellant provided the guns to the others involved in the robbery, that he stored the guns prior to the robbery, and that he owned one of the guns used in the robbery. There was no need for non-accomplice testimony connecting appellant to the use of a deadly weapon. *See id.* We conclude that the evidence was legally sufficient to support the deadly weapon finding. We overrule appellant's second point of error.

## Conclusion

We affirm the trial court's judgment.

Russell Lloyd
Justice

Panel consists of Justices Keyes, Massengale, and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).

13